[L. A. No. 27865. In Bank. Aug. 21, 1964.]

JENNY GENE FOWLER, a Minor, etc., Plaintiff and Appellant, v. ANNABELLE SEATON, Defendant and Respondent.

William P. Camusi for Plaintiff and Appellant.

Parker, Stanbury, McGee, Peckham & Garrett and Francis J. Cronin for Defendant and Respondent.

PETERS, J.—Plaintiff, Jenny Gene Fowler, a minor, appeals by her guardian *ad litem* (her father) from a judgment of nonsuit in an action for damages for injuries sustained by plaintiff while attending defendant's private nursery school.

The sole issue is whether the evidence, including all reasonable inferences, viewed, as must be done on an appeal from a judgment of nonsuit, most favorably to the plaintiff, presents a case where the jury could find that the doctrine of res ipsa loquitur applies. It is our opinion that the jury could so find, and, for that reason, that the judgment should be reversed.

First, as to the facts. In a conference held prior to the selection of a jury, the trial judge, being advised of the basic facts of the case, and of plaintiff's contention that res ipsa loquitur applied thereto, indicated the view that "a nonsuit situation" might be presented. Counsel for both parties then stipulated that, in order to save time, the jury would be deemed impaneled and sworn and the matter of nonsuit could be presented to and ruled on by the court on the basis of plaintiff's opening statement to the jury. Thus, on this appeal, the opening statement is crucial. It is as follows:

"Plaintiff in this case of Fowler versus Seaton expects to prove the following facts: Minor plaintiff, Jenny Gene Fowler began attending the Happy Day Nursery School in September, 1958. The Happy Day Nursery was a pre school nursery where children would be left for the day by their parents. Their nursery consisted of a house and a little children's playground with such play things as a swing and slide and similar paraphernalia. The Happy Day Nursery is located in the City of Van Nuys, County of Los Angeles, State of California. The Happy Day Nursery was owned and operated at all times herein relevant by the defendant, Annabelle Seaton.

"The nursery school made a weekly monetary charge to the parents of such pre school age children who attended there. The school is, of course, a private school and the defendant was at all times licensed to operate such a school.

"On January 21, 1959 the minor plaintiff, Jenny Gene Fowler was taken to the said Happy Day Nursery School by her mother and left in charge of and custody of the defendant at about 9:00 a. m. of that day. At that time Jenny Gene Fowler was three years and ten months of age. When her mother left her in the custody of the defendant on that morning of January 21, 1959, Jenny Gene Fowler was in good health and sound of limb and body and she was well and had no marks on her body.

"Jenny Gene Fowler's mother picked her up at the nursery school at approximately 6:00 p. m. of said day. At that time the defendant told plaintiff's mother that Jenny Fowler had had an accident in that the child had wet her pants.

"However, we will offer proof that the child had stopped wetting her pants approximately a year prior to this day of January 21, 1959.

"On the way home that evening and for the remainder of the evening the child appeared downcast or depressed and stayed close to her mother at all times. At the dinner table at approximately 7:00 p. m. Jenny Gene Fowler's father noticed that the child's eyes were crossed. The child's hair was arranged in bangs over her forehead and her forehead was not usually visible. At that time the mother approached the child to look into the child's eyes. The mother pushed the child's hair away from the forehead, for the first time noticed a sizable round protruding bump on the child's forehead.

"Jenny Gene Fowler had been in the mother's immediate presence ever since the mother had picked her up at the school, the nursery school, and the child had not received any injury or had not been in any accident whatsoever from the time she was picked up at the nursery school until her parents observed the cross eyes and bump on the child's forehead at the dinner table.

"The mother immediately called the defendant at the nursery school and asked what had happened to plaintiff at the school that day. Defendant replied that another child had struck the plaintiff.

"Attorney for the minor plaintiff took the deposition of the defendant Annabelle Seaton and Miss Seaton testified in effect as follows:

"Near the end of the day defendant had four or five children in a room seated in a semi circle on the floor looking at television while the children were waiting to be picked up by their parents. Minor plaintiff was one of the children in this group. None of the children in this group were more than five years of age. The defendant testified that she was in the room somewhat behind the children at the time observing them, when suddenly a little boy named Bobbie Schimp seated on the floor next to minor plaintiff hit minor plaintiff without warning in the forehead area of her head. The defendant testified that Bobbie Schimp had nothing in his hands.

"Some time early the following morning, January 22, 1959, minor plaintiff had a nose bleed and was vomiting. She also had a slight temperature. From the evening of January 21, 1959 minor plaintiff's eyes would intermittently cross and uncross until within several months the child's eyes were constantly crossed.

"The minor plaintiff had never had cross eyes before the accident. Plaintiff will prove by a competent medical doctor that plaintiff, Jenny Gene Fowler, suffered a concussion of the brain on January 21, 1959, and that a blow to the forehead —and that said blow to the forehead caused said concussion, that said blow and assault resulted, and shock resulted in Jenny Gene Fowler's eyes becoming crossed.

"We will prove through said medical authority that some children have a latent tendency to crossing of the eyes. That the fusion mechanism which causes a person's eyes to function in parallel unison and see singularly is very delicately balanced in a small child the age of minor plaintiff, and that a blow or deep shock which might result from a blow may cause the fusion mechanism to cease to function properly and that the delicate muscles of the eyes become imbalanced.

"As a result of the accident minor plaintiff had had surgery to the right eye. Her eyes are still crossed. We will prove through a medical specialist that one additional operation will be necessary and possibly a third, that cosmetically the appearance of plaintiff's eyes can be improved to normal or almost normal position, she may have some impairment of good sight.

"We will offer proof of certain unpaid medical bills to which plaintiff is responsible and the estimated cost of future medical care and surgery to her eyes necessitated by the accident.

" [E]ither because of the shock or fright resulting from the

accident or because of the age of plaintiff, she has been unable to state or give any information concerning the accident. No information is available from the other children because of their tender years.

"Plaintiff will prove through a medical doctor that the blow on the forehead and resulting concussion to minor plaintiff on January 21, 1959 was of such a force that it would have been impossible for a boy five years of age or less sitting on the floor with nothing in his hands to have delivered a blow of such force as to have caused the said injuries to minor plaintiff, and that the only inference that can be drawn is that the defendant, Annabelle Seaton, is not telling us what really happened that day at the nursery school and that the only reasonable inference which can be drawn is that the defendant, Annabelle Seaton, did not exercise reasonable care for the safety of the children in her care and custody, and, more specifically with reference to minor plaintiff.

"I should also state with regard to the damages sustained by the minor plaintiff and as a result of her eyes crossing she has become more withdrawn and has certain psychological problems and has not done as well in school as she might otherwise had it not been for this accident."

In accord with the agreement made prior to the trial defendant moved for a nonsuit at the conclusion of the opening statement. After argument by both parties—directed solely to the question of whether the doctrine of res ipsa loquitur could be applicable—the motion was granted and judgment was entered accordingly.

It is our opinion that the jury could find that the doctrine of res ipsa loquitur applies under the facts here involved. Generally, that doctrine applies "where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible." (*Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97] ; accord *Faulk* v. *Soberanes,* 56 Cal.2d 466, 470 [14 Cal.Rptr. 545, 363 P.2d 593] ; *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 446 [247 P.2d 344].) Conversely, where no such weight of probabilities can be found, res ipsa loquitur does not apply. (*Tucker* v. *Lombardo,* 47 Cal.2d 457, 465 [303 P.2d 1041] ; *Zentz* v. *Coca Cola Bottling Co., supra,* at p. 442; *LaPorte* v. *Houston,* 33 Cal.2d 167, 169 [199 P.2d 665].)

One of the frequently quoted statements of the applicable

rules is to be found in the opinion of Chief Justice Erle in *Scott* v. *London & St. Katherine Docks Co.* (1865) 3 H. & C. 596, quoted in Prosser on Torts (2d ed. 1955) section 42, at page 201, as follows: "There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

■ Of course, negligence and connecting defendant with it, like other facts, can be proved by circumstantial evidence. There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. ■ Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. (Prosser on Torts, *supra*, at p. 204.)

■ As applied to this case, the test is whether a reasonable man could reach the conclusion from the evidence offered that it was more likely than not that the injury involved was the result of negligence on the part of defendant. ■ In applying that test, and in weighing the evidence, we must keep in mind the warning given in *Ybarra* v. *Spangard*, 25 Cal.2d 486, 489-490 [154 P.2d 687, 162 A.L.R. 1258], that the court should not "lay undue emphasis on the limitations of the doctrine," or give too "little attention to its basic underlying purpose," otherwise "a simple, understandable rule of circumstantial evidence, with a sound background of common sense and human experience, has occasionally been transformed into a rigid legal formula, which arbitrarily precludes its application in many cases where it is most important that it should be applied. If the doctrine is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.' "

■ From the opening statement it appears that the defendant, for pay, operates a private preschool nursery. The plaintiff, aged 3 years and 10 months, and so, of course, incapable, as a matter of law, of being contributively negli-

gent, was turned over to that school at 9 a. m., in a sound, healthy condition, and returned to her parents at 6 p. m. in a seriously injured condition. After the child was taken home it was discovered that she had, under the bangs that covered her forehead, a "sizable round protruding bump," and that her eyes were crossed. It was then discovered that this blow had caused a concussion of the brain, resulting in optical nerve damage that required surgery and will require future surgery.

Thus, it appears that the school was a preschool nursery operated for profit. We know, as a matter of common knowledge, that such schools are primarily intended to give the children an opportunity to engage in supervised group play and other supervised activities. Such schools hold themselves out as furnishing supervision for the children. Furnishing supervision is the basic service for which these schools charge. It is their main function. The duty owed by the operator of such a school to the students in attendance is substantially different in degree from that owed by schools whose primary function is education, where the children are much older, and where supervision is incidental. The supervision required must be commensurate with the age of the children and with their activities. Thus the several cases cited by respondent relating to the duties owed to grammar and high school students are not in point. Certainly they are not controlling.

Thus, from the opening statement, it appears that the defendant, who had the exclusive control of the plaintiff at the time of injury, was under a duty to exercise care in the supervision of the infants in her school, and to keep them under supervision at all times that they were at the nursery.

Could the jury find that it is more probable than not that such duty was violated? The answer must be yes. Not only was the plaintiff healthy when delivered and badly injured when returned to her parents, but it appears that defendant had a guilty conscience and tried to cover up the injury. Certainly, it appears that defendant knew something had happened to plaintiff while plaintiff was under her supervision. Defendant told the mother of the plaintiff when she arrived to take the child home, that Jenny had "had an accident." She had "wet her pants." This explanation is inferably false because counsel offered to prove that the child had stopped wetting her pants a year previously. But this is not all. When the mother of Jenny took her home and dis-

covered the big bruise on the forehead under the bangs, and the crossed eyes, she called defendant and demanded, quite properly, an explanation. Certainly, she was entitled to one, and to an honest one. When defendant was faced with the physical facts that her prior "explanation" obviously could not account for, she gave another story, also inferably false. She said that another child had struck the plaintiff with his hand. Then when her deposition was taken she purported to explain the concussion by stating that while seated on the floor one of the small boys in the group hit plaintiff with his hand. Plaintiff's counsel offered to prove by medical evidence that the brain concussion, here involved, could not have been caused as described by defendant.

From this evidence the jury could infer, reasonably, that the proffered explanation was false. This is important. Here we have a defendant, who had supervision of the child when the injury occurred, offering a false and certainly an unsatisfactory explanation. She was under a duty to explain. From this the jury could infer that defendant had a consciousness of guilt. This itself is evidence of a circumstantial nature that goes onto the scales in determining whether "it is more probable than not" that the injury was the result of defendant's negligence. ■ Where, under the evidence, an explanation is called for, if the defendant refuses to explain or gives a false explanation, it is reasonably inferable that the defendant is hiding something which, more probably than not, is his negligence. Similar conduct, even in criminal cases, is frequently the basis of such an inference. Inferences based on evidence of flight, on failure to deny accusatory statements, on recent possession of stolen goods, and on false explanations, are familiar examples. (See 19 Cal.Jur.2d, Evidence, § 400 et seq., p. 139 et seq.; Code Civ. Proc., § 1870, subd. 3.)

It must be remembered that, at this stage of the proceedings, we are involved solely with the question of whether the plaintiff has offered to prove a circumstantial case that should have gone to the jury. As pointed out, this depends on the reasonable probabilities. Is it more reasonable than not, where a sound, healthy child is delivered to the custody of defendant, and a badly damaged child with concussion of the brain is delivered back, that defendant was negligent in her supervision, when the defendant, when faced with the physical facts, which she had not volunteered, gave a false explanation?

Certainly it is true that this was an unusual occurrence. While it may be common knowledge, as contended by defendant, that in the normal course of play children suffer bumps, bruises, and scratches, it certainly is not a matter of common knowledge that children normally come home from a nursery school with concussion of the brain and crossed eyes. If that were "normal" or "usual," nursery schools would not stay in business very long. Such a school, as already pointed out, by its very nature, holds itself out as a place where children can be safely left and carefully supervised.

Of course, in most res ipsa cases, it is incumbent on the plaintiff to show that the actions of the plaintiff did not contribute to the injuries. Here it was shown that plaintiff is of an age that, as a matter of law, she could not be guilty of contributory negligence, and also that, as a result of shock caused by the accident she cannot remember or communicate the cause of the accident. Under such circumstances, of course, she is entitled to the presumption that she exercised due care for her own safety. Thus this element of the doctrine was supplied.

Here we have a severe and unusual injury, one that does not normally occur in nursery schools if the children are properly supervised. We have a volunteer explanation that was inferably false, and, when faced with a demand to explain, the proffering of another inferably false explanation. We have a case where it appears that the plaintiff did not contribute to her own injuries. Thus the proffered evidence showed the existence of a duty of careful supervision owed by defendant to plaintiff. Under the circumstances it is inferable that defendant had a consciousness of guilt, knew the cause of the injury, was under a duty to explain, and was trying to conceal it. Thus it may be reasonably inferred that the duty was violated. Certainly it is more probable than not that the injury was the result of defendant's faulty supervision. Thus the jury could find that the doctrine of res ipsa loquitur is applicable, and for that reason it was error to grant the nonsuit.

The judgment appealed from is reversed.

Gibson, C. J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J., Dissenting.—On the undisputed facts of this record it is my opinion that plaintiff had failed to adduce sufficient evidence to justify relieving her of all burden of

proof on the issue of negligence by application of the doctrine of res ipsa loquitur. Even that "simple, understandable rule of circumstantial evidence" (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [1] [154 P.2d 687, 162 A.L.R. 1258]) must be founded on proof rather than conjecture: as said in *Nelson* v. *Douglas Pedlow, Inc.* (1955) 130 Cal.App.2d 780, 784 [6] [279 P.2d 823], "The res ipsa loquitur doctrine is not intended to open the door for mere speculation as to the cause of an injury." Here a necessary prerequisite for its application was *a showing of facts* sufficient to establish that the accident was *more probably than not* the result of defendant's negligence, for "In the absence of such a probability there would be no basis for an inference of negligence which would serve to take the place of evidence of some specific negligent act or omission." (*Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 443 [2] [247 P.2d 344].) As with all other elements of a plaintiff's prima facie case, it is the plaintiff who has "the burden of establishing the elements which permit application of the res ipsa loquitur doctrine" (*Danner* v. *Atkins* (1956) 47 Cal.2d 327, 331 [3] [303 P.2d 724]). In my view, plaintiff in the case at bench has failed to sustain that burden; and by condoning such failure the majority opinion—when stripped of its tone of moral indignation—in effect holds defendant absolutely liable for this unexplained accident.

The governing law may be briefly stated. In order to show that the accident was more probably than not caused by defendant's negligence, plaintiff must establish a probable violation of a duty of care owed to her by defendant. In the few reported cases involving a personal injury action against a private school by one of its pupils, the courts have implied that such duty of care may include (1) a duty to provide adequate supervision of the pupils' activities (*Martin* v. *Roman Catholic Archbishop* (1958) 158 Cal.App.2d 64, 66[1a]-69[1b] [322 P.2d 31]), and (2) a duty—analogous to that of an occupier of land towards an invitee—to keep the school premises in a reasonably safe condition and state of repair (*Perbost* v. *San Marino Hall-School* (1948) 88 Cal. App.2d 796, 802 [9a]-804 [9b] [199 P.2d 701]); in each instance it was specifically observed that the school was not an insurer of the safety of its pupils, but could be held liable only for a violation of such duty. To this extent at least, the duties of care of a private school towards its pupils are similar to those of a public school. (See *Pirkle* v. *Oakdale*

*Union etc. School Dist.* (1953) 40 Cal.2d 207, 210 [1] [253 P.2d 1] [adequacy of supervision]; *Ziegler* v. *Santa Cruz City High School Dist.* (1959) 168 Cal.App.2d 277, 280 [2]-283 [6] [335 P.2d 709], and cases there cited [dangerous or defective condition; see former Gov. Code, § 53051]; see generally Notes, 86 A.L.R.2d 489; 160 A.L.R. 7; *id.* at p. 250.)

In the case at bench plaintiff fails to present sufficient facts from which it can be concluded that defendant *more probably than not* violated one or the other of the above mentioned duties of care. As to the condition of the premises, plaintiff offers only the statement that defendant's school ''consisted of a house and a little children's playground with such play things as a swing and slide and similar paraphernalia.'' There is no showing whatever that any of such paraphernalia was dangerous or defective for use as nursery school equipment; or that if it was, defendant had notice of such condition yet knowingly allowed it to continue ''for such a period of time as would enable a reasonably prudent person to discover and remove it'' (*Perbost* v. *San Marino Hall-School* (1948) *supra,* 88 Cal.App.2d 796, 803 [14]). Even in a case where the instrumentality that injured the plaintiff schoolchild was identifiable (*Novack* v. *Los Angeles School Dist.* (1949) 92 Cal.App.2d 169, 172 [1] [206 P.2d 403] [plaintiff found lying in school playground pinned beneath an overturned wooden box ordinarily used to store athletic equipment]), the court affirmed a judgment of nonsuit on this ground. Pointing out that ''There was no evidence that the box was unstable or wobbly in its upright position on the playground at the place where the accident occurred or at any place thereon, or that it had ever fallen except when it was pushed over'' and that ''There was no evidence from which it could be inferred that the box fell by reason of weather conditions, or that it toppled over by reason of any instability of, or structural defect in, the box itself,'' the court concluded that ''The doctrine of res ipsa loquitur is not applicable here.'' Likewise, where as in the present case plaintiff offers no evidence concerning the probabilities of the accident's being caused by a dangerous or defective condition of defendant's school equipment or premises, an insufficient showing has been made to justify invoking res ipsa loquitur on that ground.

The majority are silent on the matter of the condition of the premises, and hold only that defendant violated her ''duty to exercise care in the supervision of the infants in her school,

and to keep them under supervision at all times that they were at the nursery.'' (*Ante*, p. 688.) On this point the majority disparage the relevance of decisions of our courts discussing the duty of supervision owed to grammar and high school pupils; but as the majority also acknowledge, the difference is ''in degree'' rather than in legal character. The majority's statement (*ante*, p. 688) that ''The supervision required must be commensurate with the age of the children and with their activities'' touches on the true issue in this case. When is the supervision thus ''commensurate?'' Or, conversely stated, when is it not commensurate?

The reported decisions answer this question by reference to established principles of the law of negligence, and hold that in any particular instance the standard of supervision required is that which an ordinarily prudent person would provide *in the same circumstances.* ''The standard of care required of an officer or employee of a public school is that which a person of ordinary prudence charged with his duties, would exercise under the same circumstances.'' (*Pirkle* v. *Oakdale Union etc. School Dist.* (1953) *supra*, 40 Cal.2d 207, 210 [1], and cases there cited; accord, *Lehmuth* v. *Long Beach Unified School Dist.* (1960) 53 Cal.2d 544, 552 [3] [2 Cal.Rptr. 279, 348 P.2d 887].) This principle serves also to delineate the scope of the school's duty to supervise: as said in *Woodsmall* v. *Mt. Diablo etc. School Dist.* (1961) 188 Cal.App.2d 262, 267 [3] [10 Cal.Rptr. 447], to ''require the constant supervision of all movements of pupils at all times'' is ''clearly not the law. A school district is required to exercise *reasonable* supervision over its students while the school is in session, but, even under such circumstances *'the law does not make school districts insurers of the safety of the pupils* at play or elsewhere.' '' ·(Italics added.) (Accord, *Taylor* v. *Oakland Scavenger Co.* (1938) 12 Cal.2d 310, 317 [7] [83 P.2d 948]; *Rodrigues* v. *San Jose Unified School Dist.* (1958) 157 Cal.App.2d 842, 845 [1] [322 P.2d 70]; *Ford* v. *Riverside City School Dist.* (1953) 121 Cal.App.2d 554, 562-563 [5] [263 P.2d 626], and cases there cited.)

The determination of what is ''reasonable'' supervision, of course, is essentially a factual issue: ''There is no absolute rule as to the number of pupils one supervisor may adequately oversee, nor is there any fixed standard of supervision; the question as to compliance with the law is one for the determination of a jury under the facts of the particular case.'' (*Rodrigues* v. *San Jose Unified School Dist.* (1958) *supra*,

157 Cal.App.2d 842, 848 [6]; accord, *Woodsmall* v. *Mt. Diablo etc. School Dist.* (1961) *supra*, 188 Cal.App.2d 262, 266 [3]; *Wright* v. *City of San Bernardino High School Dist.* (1953) 121 Cal.App.2d 342, 345 [263 P.2d 25].) The foregoing rules govern equally a private school's duty to supervise its pupils, for the law is no stricter in such case; indeed, the express declaration of Education Code section 13557 that "Every teacher in the public schools shall hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess" has been held inapplicable to a private school (*Martin* v. *Roman Catholic Archbishop* (1958) *supra*, 158 Cal.App.2d 64, 66-67 [2]).

The issue being therefore one of fact, the burden was on plaintiff—if she intended to invoke res ipsa loquitur—*to present such facts as were available* to show that the accident was more probably than not the result of the alleged inadequate supervision by defendant. But no such facts are presented; instead, plaintiff offers only the conclusional statement that she was left "in [the] charge of and custody of the defendant." Plaintiff fails to present even the most elementary evidence—undoubtedly obtainable by discovery—to show what the circumstances of supervision were at defendant's school: we are not told, for example, what supervisory facilities defendant held herself out as providing; how many other pupils attended the school; what was the teacher-pupil ratio; whether the number of teachers (if there was more than one) remained constant throughout the day, or whether some worked on a part-time basis; what types of conduct and activities of the children were permitted; and whether the degree of supervision varied according to the particular activity being supervised. Even if plaintiff could not determine the precise cause of the accident, no reason appears why the foregoing facts, among others—if they had been favorable to plaintiff—could not have been discovered and presented to the court. In their absence there is no factual basis on which it can be determined that the accident was more probably than not caused by a failure of defendant to provide that degree of supervision which an ordinarily prudent person would provide "in the same circumstances," for the simple reason that plaintiff has not informed the court what those circumstances were.

On this issue of duty to supervise the majority add nothing to plaintiff's insufficient factual showing, beyond reiterating several times that plaintiff was healthy when delivered to the

nursery school and injured when returned to her parents. It is settled, however, that the mere fact that an accident happened and an injury resulted does not, without more, warrant application of the doctrine of res ipsa loquitur. (See, e.g., *Depons* v. *Ariss* (1920) 182 Cal. 485, 488 [2] [188 P. 797]; *Napolin* v. *Hotel Rose* (1955) 137 Cal.App.2d 701, 708 [5] [290 P.2d 925]; *Briscoe* v. *Pacific Elec. Ry. Co.* (1948) 89 Cal.App.2d 439, 442-443 [3] [200 P.2d 875]; *Hubbert* v. *Aztec Brewing Co.* (1938) 26 Cal.App.2d 664, 668 [5] [80 P.2d 185, 1016].)

The majority also emphasize that the injury was ''unusually'' serious, and that ''it certainly is not a matter of common knowledge that children normally come home from a nursery school with concussion of the brain and crossed eyes.'' (*Ante*, p. 690.) But the fact that a particular injury is rare and does not ''normally'' occur is not in itself proof that it was probably caused by the negligence of those in charge (see *Siverson* v. *Weber* (1962) 57 Cal.2d 834, 839 [6] [22 Cal.Rptr. 337, 372 P.2d 97], and cases there cited). Here it is undisputed that plaintiff was a healthy active child almost 4 years old—i.e., of an age and competency amply sufficient to enable her to walk, run, collide with other children or solid objects, climb, fall down, swing, jump, and generally conduct herself independently of the assistance and support of others, spending an entire nine-hour day at nursery school. All parents who raise normal children must know that in the ordinary course of indoor or outdoor play—especially in conjunction with a group of other children—a child such as plaintiff will often receive bumps, bruises, and scrapes or scratches on various parts of her body. Admittedly the blow here sustained by plaintiff had serious consequences; but this *type* of physical contact—i.e., a bump on the forehead—is among those commonly suffered by children of plaintiff's age in many forms of active play, regardless of the supervision provided by parent or teacher. Indeed, in a case where the plaintiff schoolchild was able to specify in his complaint that his injuries were caused by the swinging of a bat by one of his fellow pupils while participating in a baseball game in the schoolyard (*Underhill* v. *Alameda Elementary School Dist.* (1933) 133 Cal.App. 733 [24 P.2d 849]), the court affirmed a judgment for the defendant school district after order sustaining a demurrer on the ground that no negligence was alleged, reasoning in part as follows (*id.* at p. 735 [1]): ''it is . . . a matter of common knowledge

that children participating in such games and in fact in any form of play may injure themselves and each other and that *no amount of precaution or supervision* on the part of parents or others will avoid such injuries. The injuries which may result from the playing of said games are ordinarily of an inconsequential nature and are incurred without fault on the part of anyone. In such cases there is no liability and, of course, *the fundamental rules governing liability remain the same even though the particular injury may prove to be of a more serious nature."* (Italics added.) Where, as here, the injury suffered by plaintiff may well have resulted from any one of a number of causes as diverse and unpredictable as the imagination or whim of plaintiff and her playmates, plaintiff has shown no factual basis from which it can be concluded that the accident was more probably than not the result of defendant's negligence.

The insufficiency of plaintiff's factual showing is underscored by the majority's repeated reliance on assertedly "inferably false explanations" offered by defendant as to the cause of the injury. Just what are those "false explanations"? First, the majority make much of the meager fact that defendant informed plaintiff's mother that plaintiff had wet her pants on the day in question; the majority declare that "This explanation is inferably false because counsel offered to prove that the child had stopped wetting her pants a year previously." (*Ante,* p. 688.) Even though we are reviewing a judgment of nonsuit must we accept at 100 per cent face value counsel's assertion that plaintiff had achieved unfailing bladder control at less than 3 years of age? Is it not, rather, the common experience of parents that moments of fear, glee, excitement, or otherwise undampened enthusiasm may be marred by enuresis even in children who have long since "stopped" wetting their pants on a regular basis? Obviously the shock and fear occasioned by a blow such as plaintiff apparently received could well have resulted in the typically childish "accident" reported by defendant. And reference to it as an "accident" normally indicates a kind and understanding parent or caretaker. In any event, to characterize this report as an offered false "explanation" of plaintiff's injury, as do the majority, is to presume further that a woman in charge of a nursery school could be so naive as to believe—or to expect that a child's mother would believe—that wet pants cause concussion of the brain. Even the parents of plaintiff did not discover that the latter had

any visible mark of injury until "At the dinner table at approximately 7:00 p.m. [plaintiff's] father noticed that the child's eyes were crossed. . . . The mother pushed the child's hair away from the forehead, for the first time noticed a sizable round protruding bump on the child's forehead."

The majority brand as "another story, also inferably false" defendant's sworn statement deposing that a fellow pupil struck plaintiff without warning as they were sitting in a group on the floor. The sole testimony offered to "disprove" that statement was to be that of a doctor—presumably in response to a hypothetical question—opining that it "would have been impossible" for a 5-year-old boy seated on the floor to have delivered with his bare hands a blow of sufficient force to have caused the subject injury. But such testimony would not necessarily prove defendant's statement false: it remains true that the event described by defendant could well have occurred, for the testimony of the doctor would only tend to show that it could not have alone caused the brain concussion. Of course, expert testimony that a particular event could *not* have caused the injury does not resolve the question of determining the balance of probabilities as to what *did* cause the injury, or that any act or omission of defendant caused it.

It follows that defendant's statements are not necessarily such barefaced lies as the majority imply; it is equally possible that defendant may not in fact have known the cause of the injury. At most, the statements are unsatisfactory explanations of how this accident happened; but it is not and should not be the law that the *defendant* is bound at his peril to produce a satisfactory explanation of the cause of the plaintiff's injury, unless (which is not the case here) the plaintiff has first sustained his burden of introducing facts sufficient to support an inference that the injury was more probably than not the result of negligence by the defendant. As Dean Prosser acutely observes, "if the facts give rise to no such inference, a plaintiff who has the burden of proof in the first instance could scarcely make out a case merely by proving that he knew less about the matter than his adversary." (Prosser, Torts (2d ed. 1955) p. 209.)

In conclusion, under the threat of allowing any personal injury action brought against a nursery school to go to the jury on a mere showing (1) that an accident happened and a child was hurt and (2) that the school is unable to produce a satisfactory explanation of the event, the majority here place on such schools the burden of constant, unrelenting

surveillance of every movement of every child during every moment the child is in the schools' custody, regardless of the type of activity in progress. This is a greater burden of supervision than even a parent ordinarily assumes; and it may be doubted that such a pervadingly adult-dominated atmosphere will be conducive to the development of a capacity for self-care, or of a sense of independence and emotional maturity, in the children involved.

I would affirm the judgment of nonsuit.

Traynor, J., concurred.