CHARLES HAROLD LARGENT v. CALVIN C. ACUFF AND GRACE HOSPITAL, INC.

No. 8325SC211

(Filed 3 July 1984)

1. **Physicians, Surgeons, and Allied Professions § 15.1— malpractice—expert testimony**

   In an action for medical malpractice there was no merit to defendant's contention that testimony of a medical expert witness was not sufficiently specific for the jury to do more than speculate as to the causation of plaintiff's paralysis, since the witness testified that "it is quite likely that the patient may have suffered less permanent damage," and "it is quite likely that the patient may indeed have had less permanent damage than he turned out to have" if he had had earlier surgery, and the witness's use of "quite likely" made his statement stronger than if he had used only the word "may."

2. **Physicians, Surgeons, and Allied Professions § 21— malpractice—damages—reasonable certainty**

   There was no merit to defendant's contention in a medical malpractice action that plaintiff did not prove the amount of damages with enough certainty to support an award, since there was evidence that plaintiff was paralyzed by a fall; there was also evidence that the paralysis could have been ameliorated if certain medical procedures had been performed immediately after the fall; and it was difficult to prove with precision what part of the damages was caused by the failure to take the procedures.

3. **Physicians, Surgeons, and Allied Professions § 20.2— malpractice—defendant's contentions improperly stated—prejudicial error**

   The trial court in a medical malpractice case erred in its jury charge by misstating defendant's contention with respect to his diagnosis and treatment of plaintiff, and it was crucial to defendant's case that his contention be prop-

erly stated in light of testimony by a medical expert that defendant's treatment of plaintiff was negligent and based on a negligent diagnosis.

APPEAL by defendant Calvin C. Acuff from *Johnson, Judge.* Judgment entered 28 May 1982 in Superior Court, BURKE County. Heard in the Court of Appeals 6 February 1984.

This is an action for medical malpractice. The plaintiff was a patient of the defendant Calvin C. Acuff, a medical doctor, in Grace Hospital in Morganton, North Carolina, on Friday, 31 October 1974 at which time he went home for the weekend. The plaintiff began spitting blood on Sunday evening and returned to the hospital at approximately midnight. The plaintiff left his bed to go to the bathroom in the early morning hours and passed out. He was found on the floor of his room by nurses at approximately 4:00 a.m. A nurse called Dr. Acuff and told him Mr. Largent had fallen. She also told Dr. Acuff that Mr. Largent could talk but had told them he could not move. Dr. Acuff instructed the nurse to "log roll" and "sandbag" Mr. Largent. This is a procedure which immobilizes the patient and Dr. Acuff testified he had this done so that if the patient had a neck injury it would not become worse. Dr. Acuff went to the hospital at approximately 5:00 a.m. He gave Mr. Largent certain neurological tests to determine whether he had damage to his nervous system. He also had a portable x-ray done at his bedside. X-rays were done in the x-ray department that afternoon which were not seen by Dr. Acuff, who left for Hawaii the next morning for a medical seminar. The x-rays taken at Mr. Largent's bedside did not reveal any fracture but the x-ray taken in the x-ray department revealed he had an undisplaced fracture. When the x-ray taken in the x-ray department was seen by a neurosurgeon, an operation was performed. The plaintiff remains a quadriplegic.

Dr. Hiram B. Curry testified that in his opinion Dr. Acuff did not meet the standard of reasonable medical care of those in his profession with similar training and experience situated in a similar community in his treatment of Mr. Largent, when he did not return to the hospital at midnight when Mr. Largent re-entered the hospital, or in his treatment of Mr. Largent after he fell. Dr. Courtland Davis, a professor of Neurosurgery at Bowman Gray School of Medicine, testified that the paralysis incurred by the plaintiff when he fell was immediate and irreversible. In his

opinion, there was nothing any doctor could have done that would have changed the course of events which were set in motion as a result of the plaintiff's fall. He testified that the operative procedure performed by Dr. Kim, the neurosurgeon, was not indicated and may have worsened the plaintiff's condition. Four family practitioners in Burke County testified that the defendant met the standard of care for family practitioners in Burke County.

The court submitted an issue of negligence as to the defendant's treatment of the plaintiff until the time of the fall which the jury answered in favor of the defendant. The court also submitted an issue of negligence as to the defendant's treatment of the plaintiff after the fall which was answered in favor of the plaintiff. The jury assessed damages in the amount of $150,000.00. The defendant appealed.

*Simpson, Aycock, Beyer and Simpson, by Samuel E. Aycock and Louis E. Vinay, Jr., for plaintiff appellee.*

*Mitchell, Teele, Blackwell, Mitchell and Smith, by W. Harold Mitchell and Marcus W. H. Mitchell, Jr., for defendant appellant.*

WEBB, Judge.

[1] The defendant's first assignment of error is to the denial of his motion to dismiss the action. He argues that the only evidence as to the causation of the plaintiff's injury was the testimony of Dr. Curry and this was not sufficient to establish proximate cause. Dr. Curry testified that in examining the medical records as to the action Dr. Acuff took when he came to the hospital after Mr. Largent fell, he observed that Dr. Acuff in his notes "comments about that the neck was freely movable." Dr. Curry testified:

> "Well, here is a man who has paralyzed immediately on falling, paralyzed in both arms and legs, absolutely helpless and most anyone, I believe, would have surmised the man had a broken neck. Certainly had an injured spinal cord to cause him to be a quadriplegic, that is, paralyzed in all four extremities, and then for the doctor to examine him in such a manner and then write in his notes that his neck was freely movable, makes me cringe because greater damage could be

done to the spinal cord. Ordinarily you exert great care in immobilizing the neck so that the patient would not move his neck and possibly have additional injury to the spinal cord."

Dr. Curry also testified:

"I believe that any general practitioner of my knowledge — I have never met a general practitioner in my life that I do not believe would have responded differently and I believe more appropriately than did Doctor Acuff in this situation. A man with a fall, with pain in the neck and shoulder, with immediate paralysis in both arms and both legs, and then to entertain the notion of hysteria, not to call for help, not to — seemingly not to even think about calling for the neurosurgeon, and you did have a neurosurgeon on your active staff. Even a nurse earlier had even asked if — earlier or about that time, even asked Doctor Acuff if he would like her to call Doctor Lee, the surgeon, or Doctor Kim, the neurosurgeon, and he declined."

Dr. Curry testified further that Mr. Largent had "in laymen's terms" a broken neck and went into some detail about the need for evaluating very quickly in order to prevent paralysis and possible damage to the spinal cord.

Questions were put to Dr. Curry which he answered as follows:

"Q. Do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty whether Dr. Acuff's failure to promptly request a consultation by a neurosurgeon after he discovered that Mr. Largent was unable to move his arms and legs, was breathing solely by diaphragm, and was complaining of pain in his neck and shoulder, was a cause of the paralysis suffered by Mr. Largent?

A. Yes. Let me discuss this just a little bit, because it is my believe [sic] that had Doctor Acuff called a neurosurgeon promptly and had the actions that were taken on Wednesday afternoon and Thursday morning, November 6th and 7th, had those actions been taken on Monday morning November the 4th, as soon as possible after the fall, then I believe that it is quite likely that the patient may indeed have had less perma-

nent paralysis than he turned out to have. Is that a—does that embody the intent of your question?

Q. Yes. Doctor. Now, what is—upon what factors do you base that opinion?

A. Well, here we have a patient that has an immediate injury to the spinal cord that results in his paralysis of both arms and both legs, pain in his neck and he has a broken neck. When this—the x-rays taken later that day show the fractures. But, absolutely nothing is done in order to determine does more need to be done to try to safeguard that spinal cord. Finally, on Wednesday afternoon when Doctor Kim is brought into the case and he evaluates the tomograms and special—those are special x-rays of the neck—and he does a myelogram, then he decides yes, we need to go in and open this up, because there may be a blood clot there that's causing this abnormality visible on the x-ray. Now, if that action had taken place some seventy-two hours earlier, I believe that it is quite likely that the patient may have suffered less permanent damage."

The defendant argues that the testimony of Dr. Curry is not sufficiently specific for the jury to do more than speculate as to the causation of the plaintiff's paralysis. He points out that Dr. Curry testified "I believe that it is quite likely that the patient may indeed have had less permanent damage than he turned out to have" and "it is quite likely that the patient may have suffered less permanent damage." He contends that the use of the word "may" shows that Dr. Curry was speculating as to whether earlier surgery would have made any difference and the jury could not find from this testimony that the defendant's negligence caused the injury. We believe that considering all of Dr. Curry's testimony, it may be inferred that he felt the lack of early surgery was probably a contributing cause to the plaintiff's paralysis. The use of "quite likely" in the sentences referred to by the defendant make Dr. Curry's statement stronger than if he had used only the word "may." *See Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E. 2d 541 (1964) for a case which holds that other evidence may be considered when an expert witness' answer is not sufficiently definite.

We do not believe *Fisher v. Rogers*, 251 N.C. 610, 112 S.E. 2d 76 (1960) and *Garland v. Shull*, 41 N.C. App. 143, 254 S.E. 2d 221 (1979), relied on by the defendant, govern. In *Fisher* our Supreme Court stated the rule that " 'Expert testimony of a future consequence of a prior and subsisting injury as evidence of prospective damages must be in terms of the certain or probable and not of the possible.' (Citations omitted.)" *Supra* at 613-14, 112 S.E. 2d at 78. It held there was no error in admitting expert testimony in that case. The testimony was not similar to the testimony of Dr. Curry in this case. In *Garland* this Court held it was error to allow a medical expert to give his opinion as to future consequences of an injury when he testified he did not know the exact length of time the injury would last. We do not believe *Garland* has any application to this case.

[2]  The defendant also contends that the plaintiff has not proved the amount of damages with enough certainty to support an award. He argues that the only evidence of damages is the testimony of Dr. Curry that because of the failure to have earlier surgery the plaintiff may have had "less permanent damage than he turned out to have" and that he may "have suffered less permanent damage." He says this does not provide a reasonable basis for the awarding of $150,000.00 in damages. The Restatement (Second) of Torts § 912 at 478 (1979) says:

"One to whom another has tortiously caused harm is entitled to compensatory damages if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit."

Dobbs on Remedies § 3.3 at 151 (1973) says in part:

"Where the plaintiff can prove the fact of damage, but not the extent of it, the reasonable certainty rule as it is now applied in most courts does not require proof of damages with mathematical precision. It does require that the plaintiff adduce some relevant datum from which a 'just and reasonable' estimate of the amount might be drawn, and without any such datum in the evidence, the claim will necessarily be dismissed as speculative and conjectural. Beyond this, the plaintiff is probably expected to prove his damages with as much accuracy as is reasonably possible to him, but precision

not attainable in the nature of the claim and the circumstances is not ordinarily required."

In this case there was evidence that the plaintiff was paralyzed by a fall. There is also evidence that the paralysis could have been ameliorated if certain medical procedures had been performed immediately after the fall. It is difficult to prove with precision what part of the damages was caused by the failure to take the procedures. We believe the plaintiff has proved with as much precision as possible his damages.

[3] The defendant also contends the court committed error in the charge by misstating his contentions. We believe this assignment of error has merit. The defendant testified that he could find no evidence of fracture to the plaintiff's neck when he examined him immediately after returning to the hospital but he treated the plaintiff as if he had a broken neck. The defendant asked the court to charge the jury that he contended that not only was the diagnosis of hysterical paralysis a reasonable diagnosis, but that he proceeded in his care and treatment as if there had been, in fact, a fracture of the neck. The court charged as follows:

"The defendant further says and contends that . . . in making his diagnosis and judgment that plaintiff was suffering from hysteria paralysis; that his diagnosis was made after he had received the nurse's report regarding the plaintiff, and after he had examined the bedside x-rays . . . and only after he had made a careful and proper examination and investigation of the plaintiff's condition.

The defendant further says and contends that under such circumstances it was not necessary nor in accordance with applicable standards of practice for a general practitioner to request consultation with a neurological specialist."

The court misstated the contention of the defendant. Dr. Curry felt from his examination of the record that the defendant had diagnosed the plaintiff's condition as hysteria paralysis but the defendant's contention is that he did not make this diagnosis. The defendant contends that he considered this a possibility but he treated the plaintiff as if he had a broken neck. Because Dr. Curry placed such emphasis on what he felt was negligence in not

having a neurosurgeon examine the plaintiff early on Monday morning, which failure Dr. Curry felt was on account of a negligent diagnosis, we believe it was crucial to the defendant's case that his contention be properly stated. The failure to do so is error which requires a new trial.

We shall discuss some of the defendant's other assignments of error as the questions they pose may arise at a subsequent trial.

The defendant's third assignment of error is to the court's refusal to strike what he contends were inflammatory remarks by Dr. Curry in his testimony. He objects specifically to his statements "And, for the doctor to advise the patient to go to the hospital and then the doctor not to see the patient, that is illogical and it's open to a great deal of criticism"; as to the patient's being restricted "He should have—there is just no question in my mind about that"; "and then write in the notes that his neck was freely movable, makes me cringe because greater damage could be done to the spinal cord"; and "I believe that any general practitioner of my knowledge—I have never met a general practitioner in my life that I do not believe would have responded differently and I believe more appropriately than did Dr. Acuff in this situation."

The defendant contends that these statements were jury speeches and not proper expressions of opinion. He argues they were too inflammatory to be admitted into evidence. An expert witness is allowed to conform his answer to his true opinion. *See Mann v. Transportation Co.*, 283 N.C. 734, 198 S.E. 2d 558 (1973) and *Walters v. Tire Sales and Service*, 51 N.C. App. 378, 276 S.E. 2d 729, *disc. rev. denied*, 303 N.C. 320, 281 S.E. 2d 660 (1981). We hold that pursuant to this rule the answers of the expert were properly admitted.

The defendant assigns error to the admission of testimony as follows:

"Q. Dr. Curry, do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty whether Dr. Acuff's tentative diagnosis of hysteria upon examining Mr. Largent on the morning of November the 4th

was a cause of the paralysis which Mr. Largent continues to have today?

A. Well, now, the hysteria being a cause of the paralysis—let me make this comment: The very fact that Doctor Acuff entertained the diagnosis of hysteria, the very fact that he made that diagnosis of hysteria perhaps postponed or at least prevented his taking proper action to explore what was the cause of the paralysis in the four extremities and the pain in the neck, for there is nothing in the record to suggest that he addressed that at all. He just addressed the blood loss."

The defendant contends this answer was not responsive. We believe it is clear from this answer that Dr. Curry was stating his opinion that Dr. Acuff's failure to properly diagnose Mr. Largent's trouble was a cause of his failure to take the proper action.

We do not discuss the defendant's other assignments of error as the questions they pose may not recur at a subsequent trial. The plaintiff did not appeal from the verdict in favor of the defendant as to his negligence prior to the plaintiff's fall. We do not disturb the verdict as to this part of the case. For the reasons stated in this opinion, we order a new trial as to the defendant's negligence subsequent to the fall.

New trial.

Chief Judge VAUGHN and Judge BRASWELL concur.