JAMIE LEE PRUITT, MINOR, BY HIS GUARDIAN AD LITEM, PATRICIA CLIFTON PRUITT, AND PATRICIA CLIFTON PRUITT, INDIVIDUALLY, PLAINTIFFS v. DONALD POWERS, INDIVIDUALLY, LINDA POWERS, INDIVIDUALLY, DONALD POWERS AND LINDA POWERS D/B/A LINDA'S CHILD DAY CARE CENTER, DEFENDANTS

No. COA97-360

(Filed 17 February 1998)

**1. Evidence and Witnesses § 2282 (NCI4th)— femur fracture—permanency of injury—expert testimony not too speculative**

In an action in which minor plaintiff alleged negligent supervision and care by defendant day care center, a surgeon's testimony as to the permanency of plaintiff's injuries was not too speculative to be admitted into evidence where the surgeon testified that leg-length discrepancies "can often happen with a femur fracture" similar to the one plaintiff suffered and that "there is most likely a component of permanency to this [injury]" since the testimony set forth "probable" and not "possible" consequences.

**2. Infants or Minors § 148 (NCI4th)— day care operators— injury to child—negligence**

Plaintiff's evidence was sufficient for the jury on the issue of negligence by defendant day care operators in an action to recover damages for a fractured leg suffered by a three-year-old student when he was pushed by other boys in the class where the evidence tended to show that defendants had been notified by the classroom teacher of repeated pushing incidents; defendants admittedly knew of and appreciated the danger that, if the pushing incidents continued, the boys "were going to hurt someone"; and the owners merely reprimanded the boys and neither contacted the parents of the boys nor pursued more severe options at their disposal.

Appeal by defendants Donald Powers, Individually, Linda Powers, Individually, and Donald Powers and Linda Powers d/b/a Linda's Child Day Care Center, from judgment filed 4 September 1996 and from order filed 4 October 1996 by Judge Russell G. Walker, Jr. in Randolph County Superior Court. Heard in the Court of Appeals 7 January 1998.

*Baker & Boyan, P.L.L.C., by Walter W. Baker, Jr. and Jeffrey L. Mabe, for plaintiffs appellees.*

*Frazier, Frazier & Mahler, L.L.P., by Torin L. Fury, for defendants appellants.*

GREENE, Judge.

Donald Powers and Linda Powers (Mrs. Powers), individually and doing business as Linda's Child Day Care Center (the Day Care) (collectively, Defendants), appeal from the entry of judgment on a jury verdict in favor of Jamie Lee Pruitt (Jamie) and his mother and guardian ad litem, Patricia Clifton Pruitt, (collectively, Plaintiffs) in the amount of $116,380.85.

On 11 August 1993, three-year-old Jamie fractured the femur in his leg when he fell at the Day Care. Plaintiffs brought the following claims against Donald and Mrs. Powers as owners/operators of the Day Care:

8. . . . [Defendants] negligently failed to supervise and care for minor plaintiff . . . .

9. . . . [Defendants] were negligent in the following respects:

(a) Defendants . . . failed to ensure that a safe indoor environment was provided for the minor plaintiff violating 10 NCAC 30, Rule .0601(a) and N.C.G.S. § 110-85 and § 110-91.

(b) Defendants . . . failed to keep, exercise and maintain careful and proper supervision of minor plaintiff in violation of 10 NCAC 3U, Rule .0714(e) and thereby violated N.C.G.S. § 110-85.

(c) Defendants . . . failed to keep, exercise and maintain proper supervision of minor plaintiff in violation of the laws of the State of North Carolina.

(d) Defendants . . . failed to exercise the degree of care that a reasonable person of ordinary prudence would have exercised under the same or similar conditions then and there prevailing, in violation of and contrary to the laws of the State of North Carolina.

At trial, Jamie's classroom teacher testified that as the ten three- and four-year-old children in her class were lining up to go out to play, four of the boys (including Jamie) began pushing each other playfully. The teacher described the children as particularly "excited about getting to go outside" because the weather had been too bad

for the previous two days to go outdoors. When the boys began pushing to get to the front of the line, the teacher told the children to stop pushing and separated the boys, placing Jamie near the middle of the line. As she continued to get the children ready to go outside, the boys again ran together and began pushing towards the door, at which point the teacher again separated the boys, placing Jamie near the front of the line of children, with the other three boys spaced out in the middle and back of the line. The boys immediately began pushing towards the door again as the teacher continued to try to get the children under control, and Jamie was pushed to the floor, fracturing his femur. The teacher testified that these four boys had pushed before, and that she had to "call them down . . . between four and five times a day . . . once a week or twice a week or so." The teacher had dealt with this problem "ten or more times." On the previous pushing occasions, the teacher testified that she had separated the boys from each other, and had "set them down and told them it wasn't nice to push, that they were going to hurt someone." The teacher had also talked to Mrs. Powers about her concerns that someone could get hurt due to the pushing "about a week or two before" Jamie's fall, and had asked Mrs. Powers to speak to the boys about it. After learning about the problem from the teacher, and before Jamie's fall, Mrs. Powers did place the boys in a "time out" circle to talk to them, and spoke to the boys about their "pushing and shoving."

The manual for the Day Care provided, in pertinent part, for the following disciplinary procedures:

> When a child misbehaves, we will use our time out chair as a disciplinary action. The child will be required to sit quietly for 2 to 5 minutes. We will also take certain activities away from him for a short period of time. If for some reason this does not work with your child we will resort to calling either one or both parents at work to help us work out the problem. . . .

> Children are going to be children and there will always be a certain amount of fighting, biting, and pulling hair among these children. At times this is hard to control, so parents! If we call you at work please understand that this is important or we would not be calling to disturb you on your job. We have had to do this in the past, so we know that this does work.

Mrs. Powers testified that she did not talk with the parents of the boys about the pushing incidents prior to Jamie's fall. Mrs. Powers had the authority to dismiss children from the Day Care for bad behavior, but did not feel the pushing incidents were severe enough

to warrant dismissal. Another option would have been to separate the four boys into different classrooms. This option, however, would involve placing the boys either in a classroom with five-year-olds or in a classroom with two-year-olds, and therefore would require special permission from the State. Mrs. Powers further testified that placing children out of their age group was generally done only when "a child is ahead or behind in their academics." Mrs. Powers did not believe separating the boys into different classrooms was a viable solution for the pushing incidents.

Mark J. Warburton, M.D. (Dr. Warburton), an orthopedic surgeon who examined Jamie, testified during his deposition:

> This particular type of injury, and in this case we have seen that the fracture has healed, but there is always a concern that there may be a leg-length discrepancy. By that I mean that one leg would be longer or shorter than the other. And this can often happen with a femur fracture in a child.

> Unfortunately, we would have to wait until the child was fully mature, which would be for a male sixteen or seventeen years of age. So, therefore, we do feel that there is most likely a component of permanency to this. And I feel that the average percentage for an injury of this type in a child, at any rate, would be 15 percent.

Defendants objected at trial to the admission of this portion of Dr. Warburton's deposition testimony. The trial court overruled Defendants' objection and entered Dr. Warburton's entire deposition into evidence.

At the close of the evidence, Defendants made a motion for directed verdict. The trial court denied the motion for directed verdict as to Plaintiffs' ordinary negligence claim (at paragraph 9(d) of Plaintiffs' complaint), but allowed the directed verdict motion as to each of Plaintiffs' remaining claims because there was no evidence presented at trial to support a finding either that the supervising teacher in the classroom was negligent, or that statutory or administrative operating rules for day care centers had been violated. During the charge conference, Defendants objected to the judge's proposed jury instruction as to the permanency of Jamie's injuries. The court overruled this objection, and included the following in the jury charge:

PRUITT v. POWERS

[128 N.C. App. 585 (1998)]

Damages [in relation] to Jamie Pruitt in this case would include damages for pain and suffering and for permanent injury. . . . An injury is permanent when any of its effects will continue through the plaintiff's life. These effects as I have said may include future pain and suffering that may be experienced by the plaintiff over his life expectancy.

The jury unanimously found that Jamie was "injured by the negligence of [Defendants]," and awarded Plaintiffs $106,000.00 for Jamie's pain and suffering and permanent injury and $10,380.85 for medical expenses. Defendants moved the court to order a judgment notwithstanding the verdict (JNOV) and, in the alternative, to order a new trial. Both motions were denied.

---

The issues are whether: (I) testimony as to the permanency of Jamie's injuries was too speculative to be admitted into evidence; and (II) sufficient evidence existed to deny Defendants' motions for directed verdict, JNOV, and a new trial.

I

[1] As a general rule, "a physician testifying as an expert to the consequences of a personal injury should be confined to certain consequences or probable consequences, and should not be permitted to testify as to possible consequences." *Fisher v. Rogers*, 251 N.C. 610, 614, 112 S.E.2d 76, 79 (1960). "Probable" is defined as "likely to happen," *American Heritage College Dictionary* 1090 (3d ed. 1993), and as "[h]aving more evidence for than against; . . . likely," *Black's Law Dictionary* 1201 (6th ed. 1990). By contrast, "possible" has been defined as "that [which] may or may not occur . . . ," *Webster's Third New International Dictionary* 1771 (3d ed. 1968), and as "[c]apable of existing, happening, being, becoming or coming to pass; feasible . . . ," *Black's Law Dictionary* 1166 (6th ed. 1990). *Cf. Largent v. Acuff*, 69 N.C. App. 439, 443, 317 S.E.2d 111, 113 (expert testimony that the consequences were "quite likely" properly admitted), *disc. review denied*, 312 N.C. 83, 321 S.E.2d 896 (1984); *Garland v. Shull*, 41 N.C. App. 143, 147, 254 S.E.2d 221, 223 (1979) (expert testimony that consequences "may" persist improperly admitted).

In this case, Dr. Warburton testified that leg-length discrepancy *"can often happen* with a femur fracture in a child," and that "there is *most likely* a component of permanency to this [injury]." The testimony of Dr. Warburton is in terms of the probable, not the possible,

consequences to Jamie, and was therefore properly admitted into evidence. It follows that the jury instruction on permanent injury was also proper.

## II

**[2]** We review the denial of Defendants' motions for directed verdict and JNOV to determine "whether there is substantial evidence that [Defendants'] negligence was the proximate cause of [Plaintiffs'] injuries." *Cobb v. Reitter*, 105 N.C. App. 218, 220, 412 S.E.2d 110, 111 (1992); *see also Colony Associates v. Fred L. Clapp & Co.*, 60 N.C. App. 634, 637, 300 S.E.2d 37, 39 (1983) (a motion for JNOV is reviewed under the same standard as a motion for directed verdict). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). In reviewing the relevant evidence, the trial court must "treat non-movant's evidence as true, considering the evidence in the light most favorable to non-movant and resolving all inconsistencies, contradictions and conflicts for non-movant, giving non-movant the benefit of all reasonable inferences drawn from the evidence." *McFetters v. McFetters*, 98 N.C. App. 187, 191, 390 S.E.2d 348, 350, *disc. review denied*, 327 N.C. 140, 394 S.E.2d 177 (1990). Thus the trial court must deny motions for directed verdict and JNOV if there is such relevant evidence, when viewed in the light most favorable to Plaintiffs, as a reasonable mind might accept as adequate to support the elements of negligence. *Cobb*, 105 N.C. App. at 220-21, 412 S.E.2d at 111. Defendants' essentially argue that their actions did not, as a matter of law, constitute a breach of the requisite standard of care; we therefore address only whether substantial evidence existed that the appropriate standard of care was breached.

While North Carolina case law does not specifically address the duty owed by day care providers to the children under their supervision, our courts have held that the appropriate standard of care for a school teacher is that of a person of ordinary prudence under like circumstances. *Daniel v. City of Morganton*, 125 N.C. App. 47, 54, 479 S.E.2d 263, 268 (1997). By analogy, we believe that day care providers have "a duty to abide by that standard of care 'which a person of ordinary prudence, charged with his duties, would exercise under the same circumstances.' " *Izard v. Hickory City Schools Bd. of Education*, 68 N.C. App. 625, 626-27, 315 S.E.2d 756, 757-58 (1984) (quoting *Kiser v. Snyder*, 21 N.C. App. 708, 710, 205 S.E.2d 619, 621

(1974)). "[T]he amount of care due a student increases with the student's immaturity, inexperience, and relevant physical limitations." *Payne v. N.C. Dept. of Human Resources*, 95 N.C. App. 309, 314, 382 S.E.2d 449, 452 (1989); *cf. Gurley v. St. Paul Fire & Marine Underwriters, Inc.*, 242 So. 2d 298 (La. App. 1970), *cert. denied*, 244 So. 2d 858 (La. 1971) (noting that although the standard of care owed to young children is only reasonable care, the reasonable care owed to young children entails more than the reasonable care owed to adults); *Fowler v. Seaton*, 394 P.2d 697 (Cal. 1964) (noting that preschool nurseries are primarily intended to provide supervision of very young children, and should therefore provide a higher degree of care than schools). Day care providers, however, cannot be expected "to anticipate the myriad of unexpected acts which occur daily in and about schools," and are not insurers of the safety of the children in their care. *See Payne*, 95 N.C. App. at 313-14, 382 S.E.2d at 451. The "foreseeability of harm to pupils in the class or at the school is the test of the extent of the [day care provider's] duty to safeguard her pupils from dangerous acts of fellow pupils . . . ." *James v. Board of Education*, 60 N.C. App. 642, 648, 300 S.E.2d 21, 24 (1983).

In this case, viewing the evidence in the light most favorable to Plaintiffs, substantial evidence of Defendants' negligence existed to deny the motions for directed verdict and JNOV. Defendants had been notified by the classroom teacher of repeated pushing incidents. Defendants admittedly knew of and appreciated the danger that, if the pushing incidents continued, the boys "were going to hurt someone." *See Daniel*, 125 N.C. App. at 55, 479 S.E.2d at 268 (requiring evidence that the defendant "knew of and appreciated" the danger to the plaintiff). The record reflects that Defendants neither contacted the parents of the boys, nor pursued the more severe options at their disposal. A reasonable mind might accept Defendants' failure to take any action other than reprimanding the boys for their repeated pushing as adequate to support the conclusion that Defendants violated the standard of care owed to the children under their care.[1]

Having determined that the trial court did not err in allowing Dr. Warburton's testimony as to the permanence of Jamie's injuries, and that Defendants' motions for directed verdict and for JNOV were properly denied, we likewise hold that the trial court did not abuse its

---

1. We emphasize that our holding is based on the evidence of Defendants' negligence, and is not based on any negligent conduct on the part of the teacher imputed to Defendants under the doctrine of *respondeat superior*. Indeed, our review of the record does not reveal any negligence on the part of the teacher.

discretion in denying Defendants' motion for new trial. *See Corwin v. Dickey*, 91 N.C. App. 725, 729, 373 S.E.2d 149, 151 (1988) (reviewing denial of a motion for a new trial under an abuse of discretion standard), *disc. review denied*, 324 N.C. 112, 377 S.E.2d 231 (1989).

No error.

Judges MARTIN, Mark D., and SMITH concur.